# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:16-cv-00087-MR
### CRIMINAL CASE NO. 1:12-cr-00105-MR

| | | |
|---|---|---|
| SENITA BIRT DILL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's 28 U.S.C. § 2255 motion docketed on April 1, 2016. [CV Doc. 1].[1] For the reasons that follow, Petitioner's habeas motion will be dismissed.

## FACTUAL BACKGROUND

The material facts underlying this prosecution are contained in the Information [CR Doc. 1] and were recounted at Petitioner's plea hearing. [CR Doc. 49 at 6-12]. These facts are set forth in relevant part below.

---

[1] Because this Memorandum and Order must reference documents contained on the docket in both Petitioner's civil case and in her criminal case, the Court will cite to documents from Petitioner's civil case with the prefix "CV" and from her criminal case with the prefix "CR."

Beginning in and around 2009 and continuing through to or about May 3, 2012, Petitioner and her boyfriend, Ronald Jeremy Knowles, and others agreed to defraud the United States Treasury Department by participating in a scheme to obtain false tax refunds. Federal income tax returns may be filed using paper Forms 1040 or electronically through tax preparation software such as Turbo Tax. Tax refunds are paid in multiple ways: a United States Treasury check may be mailed to an address listed on the tax return; the Treasury may make an electronic direct deposit into a bank account designated on the tax return; or a refund may be issued in the form of a pre-paid debit card that is mailed to the claimant. Participants in the scheme caused the Treasury to mail the false tax refund checks to various addresses throughout the Western District of North Carolina and elsewhere. The participants also received false tax refunds via direct deposit and pre-paid debit cards.

Petitioner and Knowles generally executed this tax fraud scheme by collecting stolen, purchased, or otherwise fraudulently obtained identification information from other persons. Typically this information would consist of the victims' names, dates of birth, and Social Security numbers (SSNs). Upon receipt of this identification information, Petitioner would prepare fraudulent federal (and sometimes state) tax returns using this personal

identifying information to represent the purported filers of the tax returns. The information entered on these returns concerning matters material to the tax return (such as income and amount of federal tax withheld) was entirely fictitious. Petitioner created these figures in an effort to maximize the amount of the refund while also attempting to minimize the risk of detection.

Petitioner would file these fraudulent returns electronically using a variety of tax preparation software programs, including Turbo Tax. Turbo Tax gave Petitioner the option of receiving tax refunds by direct deposit or in the form of pre-paid debit cards issued by Green Dot Corporation. Green Dot was a provider of pre-paid debit cards that could be used anywhere that MasterCard or Visa debit cards were accepted. Green Dot also sold a product called "MoneyPak." Petitioner could (and did) purchase MoneyPak cards and then use such cards to re-load other debit cards or transfer funds to PayPal, an online payment system used for shopping on the internet.

After filing these false tax returns, Petitioner and Knowles would collect their fraudulently claimed tax refunds in a variety of ways. Sometimes Petitioner would request that the IRS send the Treasury checks to addresses listed on the bogus tax returns. Petitioner would use addresses that were nearby to locations that both she and Knowles would frequent so that they could intercept these checks from these mailboxes. At the time of this

scheme, Petitioner and Knowles resided in a rental home in Mill Spring, North Carolina. Living in the Mill Spring home helped Petitioner and Knowles further the scheme because such home was on a lake in a neighborhood populated by vacation homes. Many of the owners of the homes in this neighborhood were seldom present, so Petitioner and Knowles were able to use these nearby addresses as repositories for Treasury checks that could be collected with little risk that the true owners of the mailboxes might recover the checks first. They also used addresses in or near Greenville and Greer, South Carolina.  Knowles owned and operated a business entity called "Next Level Entertainment" located in Greenville. Knowles often traveled to Greenville and Greer because they were close to his business. Petitioner and other coconspirators would also make rounds to collect Treasury checks from various mailboxes in other areas.

Besides having Treasury checks delivered by mail, Petitioner would request that the Treasury directly deposit tax refunds into an account at the Bank of Traveler's Rest in Greenville, South Carolina. This account belonged to Knowles' business, Next Level Entertainment. Dozens of fraudulent tax refunds were deposited into this account.  Petitioner also used her own bank account at the Woodforest Bank in Greenville, South Carolina. Petitioner opened this account in November 2009, and Knowles was listed as a

beneficiary on this account. Several fraudulent tax refunds were deposited into this account.

Petitioner and Knowles also received tax refunds in the form of pre-paid debit cards. For example, when Petitioner used Turbo Tax to file false returns, sometimes she would request that her refund be paid by debit card. Intuit (the company that sells the Turbo Tax software) would then request that Green Dot issue a debit card to the person named on the return by mailing it to the address listed on the return. Petitioner, Knowles and multiple other persons would collect these debit cards and then take them to businesses (primarily Wal Mart) that accept Green Dot cards and then use them to purchase MoneyPak cards. MoneyPak cards do not have a name printed on them. By doing this, Petitioner and Knowles were able to transfer money from a Green Dot debit card bearing the name of a person whose identity had been stolen onto a nameless MoneyPak card which in turn could then be transferred back onto a debit card bearing the names of Petitioner, Knowles, or anyone else.

Through the use of this scheme, Petitioner and Knowles filed well in excess of 1,000 false tax returns using stolen, purchased, or otherwise fraudulently obtained identification information. They made tax refund claims

against the United States government well in excess of $5,000,000 and actually received in excess of $3,500,000.

## PROCEDURAL BACKGROUND

On October 23, 2012, Petitioner and Knowles were named in a three-count Information[2] filed with the Court. [CR Doc. 1]. The United States Attorney charged the Petitioner as follows: in Count One, engaging in a false claims conspiracy, in violation of 18 U.S.C. § 286; in Count Two, committing access device fraud, in violation of 18 U.S.C. § 1029(a)(5); and, in Count Three, committing aggravated identity theft, in violation of 18 U.S.C. § 1028A. [Id.]. With the assistance of counsel, Petitioner entered into a written plea agreement with the Government in which she agreed to waive her right to indictment and to plead guilty to all three counts contained in the Information. [CR Doc. 2]. Petitioner tendered her guilty plea in accordance with her plea agreement [Cr Doc. 2] and her waiver of indictment [CR Doc. 6] to U.S. District Judge Max O. Cogburn. [CR Doc. 49]. The Court accepted Petitioner's plea on October 29, 2012. [CR Docs. 8 & 9].

---

[2] Petitioner and Knowles were also named in an Indictment, returned by the Grand Jury for this District in case number 1:12-CR-40-MR, and each charged in a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). That prosecution, however, was dismissed in lieu of Petitioner and Knowles pleading guilty to the charges contained in the Information filed in this matter. [CR Doc. 2 at 1].

Following Petitioner's plea hearing, the Probation Office prepared a draft Presentence Report (PSR) for the Court, and two revisions to the PSR thereafter. [CR Docs. 21; 22; 31]. The Petitioner's final PSR included a Guidelines sentence computation that set forth a Total Offense Level of 36. This Total Offense Level, when combined with Petitioner's Criminal History Category of VI, established her final Guidelines range to be 324 to 405 months. [CR Doc. 31 at 20]. The Court sentenced Petitioner to a total term of imprisonment of 324 months' imprisonment on April 24, 2014. [CR Doc. 41 at 2]. On April 29, 2014, Petitioner filed her notice of appeal. [CR Doc. 37].

On appeal, Petitioner raised two claims of ineffective assistance of counsel, asserting that her trial attorney was ineffective by: (1) conceding a "winning argument" concerning the Government's untimely objections to the PSR; and (2) failing to seek a continuance of the sentencing hearing once the trial court decided to consider the Government's untimely objections to the PSR. [Doc. 54 at 2]. Determining that there was no conclusive evidence of ineffective assistance of counsel on the face of the record, the court of appeals affirmed Petitioner's sentence. [Id. at 2-3]. Petitioner sought no further direct review of her case after the court of appeals issued its decision

on January 14, 2015.  Petitioner then brought this § 2255 action on April 1, 2016.  [CV Doc. 1].

## STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. The Court has considered the record in this matter and applicable authority and concludes that this matter can be resolved without an evidentiary hearing. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## DISCUSSION

Before reaching the merits of Petitioner's motion, the Court must address whether it was timely filed.  Motions to vacate under § 2255 are subject to a one-year period of limitation, which generally begins to run on "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f). For federal criminal defendants who do not file a timely petition for certiorari on direct review, their conviction becomes final, and thus, the one-year limitation period begins to run, when the time for seeking such review expires. Clay v. United States, 537 U.S. 522, 524 (2003). In this case, the one-year period of limitation began to run on April 14, 2015, ninety days after

the Fourth Circuit entered its judgment on direct appeal. Since Petitioner's §
2255 motion was filed less than one year later, on April 1, 2016, the motion
is clearly timely. The Court, therefore, will address Petitioner's alleged
ineffective assistance of counsel claims as set forth in her motion.

The Sixth Amendment guarantees that in all criminal prosecutions, the
accused shall have the right to the effective assistance of counsel for his
defense. U.S. Const. amend. VI. In order to prevail on a claim of ineffective
assistance of counsel, a petitioner must show that: (1) "counsel's
representation fell below an objective standard of reasonableness," and (2)
"the deficient performance prejudiced the defense." Strickland v.
Washington, 466 U.S. 668, 687-88 (1984). In measuring counsel's
performance, there is "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance." Id. at 689. In
the context of a guilty plea, in order to demonstrate prejudice a petitioner
must present a reasonable probability that, but for counsel's allegedly
deficient conduct, he would have elected to plead not guilty and insisted on
proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).

Petitioner states in her motion three grounds for relief, which are
premised on allegations that counsel was constitutionally ineffective in
representing her: (1) at the pretrial stage; (2) at her sentencing hearing; and

(3) on direct appeal. [CV Doc. 1 at 4; 5; and 7]. In support of each ground, Petitioner refers the Court to her memorandum accompanying her motion. [Id.]. The bulk of Petitioner's fourteen-page memorandum consists of broadly applicable principles of habeas law with five discrete pages entitled "Claim for Relief" interspersed within. [Id. at 9; 13; and 15-17]. The contents of the pages entitled "Claim for Relief" appear to be the actual bases of Petitioner's complaints about her trial and appellate attorneys yet they bear no direct relation to the legal analysis contained in the body of Petitioner's memorandum. Petitioner has not specifically cited to any legal authorities directly supporting her "Claim for Relief" allegations. Similarly, Petitioner has proffered precious few facts, and in most instances no facts at all, to support the allegations set forth in her "Claim for Relief" pages. Nevertheless, the Court will address the contents of each "Claim for Relief" page, grouping Petitioner's related allegations as separate claims for discussion.

The first claim raised by Petitioner is her assertion that trial counsel was ineffective in permitting her to plead guilty to access device fraud. This claim appears in the allegations contained on Pages 8 and 12 of her memorandum:

1) Counsel for the petitioner Ms. Senita Dill, rendered ineffective counsel at the pretrial stage of her indictment when he failed to adequately evaluate the indictment and

realize that the charge of access device fraud could not have been charged, as the petitioner did not meet the elements as charged.

1-a)  Counsel for the petitioner Mr. Dill, could have but did not review the discovery on the above issue [item 1.] and present an appropriate agrument for dismissal.

1-b)  As a result of Counsel's failure in items [1-1a] Counsel had Ms. Dill believe that this portion of the indictment could have been proved at trial and had her plead guilty to Access device fraud under 18 USC §1029(a) a charge that could not ever have been proven.

1-c).  As a result of counsels errors, Ms. Dill was coerced into pleading guilty to a charge that is inappropriate in this case which resulted in a higher sentencing range.

[CV Doc. 1-1 at 9 (grammatical and typographical errors in original)].

2)  Counsel for the petitioner violated her right to effective counsel when he failed to file a motion to dismiss the 18 USC 1029(a)(5) charge, because Ms. Dill does not meet the elements of this charge, as indicted.

2a).  Counsel for the petitioner could have but did not review the discovery, and the wording of the indictment to see that Ms. Dill did not effectuate or herself possess an access device according to the elements of the statutory authority or the wording of the indictment.

2b).  Counsel could have but did not file the motion to dismiss, instead counsel simply focused on having Ms. Dill plead guilty to all counts without raising appropriate defenses which were in fact presented to him. Including the 'career offender enhancement'.[3]

---

[3] The Petitioner was neither subjected to, nor sentenced in accordance with, the Career Offender enhancement contained in Chapter Four of the Guidelines.  See PSR at

11

2c). But For Counsel's Unprofessional errors the result of the proceedings would have been different, the Petitioner would have pleaded Not Guilty and Proceeded To Trial.

[Id. at 13 (grammatical and typographical errors in original)].

The nature of Petitioner's complaint is a claim of actual innocence: that her guilty plea to the charge of access device fraud under 18 U.S.C. § 1029(a)(5) was without factual support and thus an invalid basis for conviction. Accordingly, Petitioner asserts that trial counsel was ineffective in allowing her to tender a guilty plea to this offense. The facts of this matter, however, belie Petitioner's claim.

To be convicted of access device fraud under 18 U.S.C. § 1029(a)(5), the Government must prove the following essential elements: (1) an intent to defraud, (2) effecting transactions with one or more access devices issued to another person, (3) to receive payment(s) or thing(s) of value, (4) with a total value of $1,000 or more in a one-year period. United States v. Davenport, 445 F.3d 366, 373 (4th Cir. 2006), abrogated on other grounds, Irizarry v. United States, 553 U.S. 708 (2008). In this matter, Petitioner filed fraudulent tax returns using legitimate personal identification information

---

Paragraph 42 ("Chapter Four Enhancement: None."). [CR Doc. 31 at 10]. Therefore, the Court will not discuss this specific allegation further.

linked to real individuals. In due course, Petitioner later obtained Green Dot tax refund debit cards issued in the names of those individuals. She then used these debit cards at Wal Mart or other retailers and banks to obtain money or things of value totaling $1,000 or more during the one year time-frame from May 3, 2011, to May 3, 2012. All of this unlawful activity the Petitioner acknowledged both at her plea colloquy [CR Doc. 49 at 26] and at her sentencing hearing. [CR Doc. 48 at 6-8]. Thus, a sufficient factual basis supported her plea to the § 1029(a)(5) charge. Accordingly, Petitioner's claim that her trial counsel was ineffective in allowing her to plead guilty to the access card fraud offense is without merit.

The basis for Petitioner's second claim is that her plea bargain, and that of her co-defendant Knowles, were devised and formulated to be some sort of "package deal," and a deal that Knowles pressured Petitioner to accept. Further, according to Petitioner, her trial counsel was ineffective in not revealing to the Court that this package deal contemplated that both Petitioner and Knowles would receive equal punishment at the time of sentencing (which ultimately did not occur). These allegations appear on Page 8 of her memorandum:

> 1-d). Counsel for the petitioner Ms. Dill rendered ineffecitve assistance of counsel at the pleading and negotiation stage, when he failed to notify the court that Ms. Dill and

her husbands plea agreements were tied together in a 'package deal'. In which, Ms Dills husband received a significant sentence disparity compared to his wife. As a result of the lack of disclosure during the Rule 11 Hearing, the Court failed to inquire whether "any of her co-defendants' placed pressure on her to plead guilty".

1-e).    As a result of the failure in [ 1-d ], the prosecutor was also required to disclose the nature of the agreement with the court and failed to do so.

1-f).    The petitioner Ms. Dill incorporates ¶¶ 1- 1(f), herein But for Counsels Unprofessional Errors the Result of the Proceedings Would Have Been Different, The Petitioner Would Have Plead Not Guilty and Proceeded To Trial.

[CV Doc. 1-1 at 9 (grammatical and typographical errors in original)].

As with her first claim, this claim is without merit.  During the plea hearing conducted pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the Court established that Petitioner possessed the capacity to make a voluntary, intelligent, and informed decision and that she understood what she was then in the process of doing by entering a guilty plea.  In response to questions from the Court, Petitioner stated under oath that she had obtained her high school diploma and completed two years of college, that she was not suffering from a physical or mental problem that would impair her ability to understand or participate fully in the proceeding, and that she was not under the influence of any drugs or intoxicants that would affect

her reasoning, comprehension, or communication skills. [CR Doc. 49 at 21-23].

The Court then questioned Petitioner regarding her understanding of the terms of the plea agreement. The Court specifically inquired as to whether she was voluntarily pleading guilty:

> THE COURT: Okay. Is your plea of guilty voluntary and not the result of any coercion, threats or promises other than contained in the written plea agreement, Ms. Dill?
>
> DEFENDANT DILL: Yes, sir.

[CR Doc. 49 at 36]. The Court went even further and inquired whether any promises existed beyond what was written in Petitioner's plea agreement:

> THE COURT: Mr. Gast, is there anything about those plea agreements you wish to put on the record today?
>
> MR. GAST: No, sir. All the terms and conditions of the pleas are contained within each plea agreement filed with the Court.
>
> THE COURT: All right. Thank you very much.
>
> MR. GAST: Yes, sir.
>
> THE COURT: Do you understand, Ms. Dill, what the Assistant U.S. attorney said?
>
> DEFENDANT DILL: Yes, sir.

> THE COURT: That all of the promises and all the terms and conditions of your agreement are in the written plea agreement that you have signed. Do you understand that?
>
> DEFENDANT DILL: Yes, sir.

[Id. at 38].

Also during her plea hearing, the Court explained to Petitioner the sentencing process and the role of the advisory Sentencing Guidelines. In response, Petitioner acknowledged that the Court would not be bound by the Guidelines but nonetheless must consult the Guidelines and take them into account when sentencing. She further acknowledged that any sentence imposed would be within the statutory limits and within the Court's sound discretion and could be greater or lesser than the sentence provided for by the Guidelines. [Id. at 31]. Petitioner also acknowledged that if her sentence were more severe than she expected, or the Court did not accept the Government's sentencing recommendation, if any, she would still be bound by her plea and would have no right to withdraw her plea of guilty for that reason. [Id. at 32]. At the conclusion of the plea hearing, the Court specifically inquired as to whether Petitioner had any questions regarding anything that had been said during the hearing. Petitioner indicated that she did not have any statements, comments, or questions for the Court. [Id. at 40-41].

True to her word at the conclusion of her plea hearing, Petitioner made no statements or comments at all.  In fact, at no time during the pendency of her criminal case, or during the direct appeal of the same, did Petitioner state that any promises or representations were made by the Government or her attorney requiring that her punishment be linked to that of her co-defendant or that her sentence would be equal in severity to his.  On the contrary, the Petitioner's sworn testimony at her plea hearing discloses that she fully understood that her sentence would be the product of the Court's discretion after assessing the facts and circumstances of the case and considering the applicable advisory Guidelines.  Petitioner never asserted, during her plea hearing or during her sentencing hearing, that her sentence must be tied in any way to the sentence imposed upon Knowles.  The Petitioner's thread-bare assertion that she did not receive the benefit of an alleged package deal is thus entirely undermined by her sworn testimony at her Rule 11 proceeding.  If the solemnity, care, and personal attention required of a plea colloquy has any meaning at all, its binding force cannot be undone simply by the factually unsupported, post-hoc allegations of a disgruntled defendant.  See United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005) ("Thus, in the absence extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and

a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements. Otherwise, a primary virtue of Rule 11 colloquies would be eliminated....") (citing Blackledge v. Allison, 431 U.S. 63, 79 n. 19 (1977)). For these reasons, Petitioner's claim that her trial counsel was ineffective in not revealing to the Court a purported package deal plea bargain is without merit.

The third claim raised by Petitioner is her assertion that trial counsel was ineffective in not challenging the amount of loss attributable to Petitioner for sentencing purposes. This claim appears in the allegations contained on Page 14 of her memorandum:

> Counsel for the petitioner Violated her Sixth Amendment Right to effective assistance of counsel when he failed to properly object to the government's calculation. The government took all of the gross sales for six years and went to a "loss chart" and applied the level which corresponded to the money that they took in, for all tax filing and other tax products services. Counsel could have but did not object to all customers being victims and argued that some legitimate services were rendered. These services are required to be credited against the loss amount. Counsel failed to hold the government to its level of proof required to support the offset.

> But for Counsel's unprofessional errors the result of the proceedings would have been different. The petitioner would have plead not guilty and proceeded to trial.

[CV Doc. 1-1 at 15 (grammatical and typographical errors in original)].

Petitioner asserts her trial counsel failed to challenge the loss amount calculated under the Guidelines. She correctly points out that any lawful tax services she provided that resulted in a legitimate tax refund generated by the Treasury should be deducted from such loss amount. Petitioner, however, has failed to set forth any facts indicating that she performed any lawful tax preparation services during the time in question. Petitioner's PSR indicates that for the tax years spanning from 2009 until 2012, she had no reportable earnings. [CR Doc. 31 at 19]. Preparation of any legitimate tax returns would have generated legitimate pay. More importantly, however, Petitioner has failed to identify any legitimate tax refunds that were included within the Guidelines loss amount. For these reasons, Petitioner's claim that trial counsel was ineffective in not challenging the amount of loss attributable to her for sentencing purposes is without merit.

While not the model of clarity, Petitioner's fourth claim appears to be based upon revisions to her PSR made as a result of the materials the Government included within its late-filed objections to the Draft PSR. Petitioner asserts that trial counsel was ineffective when he failed to persist in his objection to the untimeliness of the Government's filing of its sentencing materials. She argues that the information contained within those documents resulted in the revision of the Petitioner's PSR to her

detriment. This claim appears in the allegations contained on Pages 14 and

15 of Petitioner's memorandum:

> Counsel for the petitioner violated her Fifth and Sixth Amendment Right(s), to due process and to effective assistance of counsel at her sentencing hearing, when he incorrectly challenged errors in the PSR which enhanced the petitioner's sentence, he failed to identify the proper citation to authority, and support the position herein with proper case law resulting in a significant enhanced sentence. Particularly the enhancement for leadership.

\* \* \* \* \* \* \* \* \* \*

3).    Counsel for the petitioner Ms. Dill was ineffective when he withdrew his objections to the government's late filing on objections to the PSR.

3b).    Counsel for the petitioner should have left the objections to the government late filing, because they in fact demonstrate that the government was attempting and in fact did, manipulate the facts to seek a longer sentence, when it colluded with the Probation Office to revise the PSR and then filed a late report and then filing the government late memorandum.

3c).    Counsel could have but did not seek a continuance so that he could have placed on the record, the conversations which took place between the Government and US Probation demonstrating the collusion between the two. As a result Ms. Dill's counsel acquiessed to the government, resultng in an unchallenged collusion. US Probation is directed to be an independant third party, but instead, serves as an extension of the U.S. Prosector's office.

3d).    Counsel could have but did not contact the head of US Probation to discuss the matter, but did not. Likewise Counsel could have but did not contact the head of the US Attorney's Office, but did not.

3e).   Counsel is directed under the Sixth Amendment to be an advocate for the defendant Ms. Dill. He was required to seek an understanding of what took place between US Probation and the US Attorney's office and reasons for the revised PSR and the late filings. He was obligated to ensure that appropriate process took place. He went as far as filing for a continuance and objecting to the late filing, yet when it came down to the 'advocacy' portion of his representation he fell far short and simply withdrew the objections.

3f).   Ms. Senita Dill herein incorporates ¶¶ 3 - 3f herein, But For Counsel's Unprofessional Errors the Result of the Proceeding Would Have Been Different, The Petitioner Would Have Plead Not Guilty And Proceeded To Trial.

[CV Doc. 1-1 at 15-16 (grammatical and typographical errors in original)].

To place Petitioner's claim in context, the Court briefly recites the procedural history leading to her sentencing hearing. Petitioner's Draft PSR was filed on December 4, 2013. [CR Doc. 21].  The Guidelines calculation within the Draft PSR set forth no adjustment for Petitioner's role in the offense [id. at ¶ 36], but did recommend that the Court grant Petitioner a three-level reduction for accepting responsibility for her crimes. [Id. at ¶¶ 40-41].   Petitioner's advisory Guidelines range in the Draft PSR was 151 to 188 months' imprisonment. [Id. at ¶ 77]. The parties were required to file any objections to the contents of the Draft PSR on or before December 21, 2013. As of that date neither party filed any objections related to the Draft PSR and,

consequently, none of the discussed variables changed when the "Final" PSR was filed with the Court on December 31, 2013.  [CR Doc. 22].

On January 30, 2014, the Government filed PSR objections clearly outside the prescribed period.  [CR Doc. 26].  The Government asserted that a four-level increase was warranted in light of the Petitioner's role in the offense [id. at 1-2] and that Petitioner should be denied any reduction for acceptance of responsibility.[4]  [Id. at 2-3].  Petitioner's counsel objected to the Government's filing on timeliness grounds and moved to strike the same.  [CR Doc. 27].  On February 7, 2014, the Government filed a motion for leave to file its PSR objections out of time.  [CR Doc. 30].  The Court granted the Government's motion for leave and denied Petitioner's motion to strike without prejudice to Petitioner renewing the same at her sentencing hearing.  [CR Docket Sheet]. Thereafter, the Probation Office revised Petitioner's PSR based upon the new materials provided by the Government.  [CR Doc. 31].  In particular, the PSR was amended to provide for a four-level role adjustment increase. [Id. at ¶ 39].  Based upon the materials filed by the Government, the Probation Office determined that Petitioner was a leader or

---

[4] The Government also asserted that a two-level increase was warranted for the Petitioner's alleged obstruction of justice. [CR Doc. 26 at 2].  That assertion was overruled and is otherwise not at issue herein.

organizer of criminal activity that included five or more participants. The PSR was also amended to remove the three-level reduction for acceptance of responsibility. [Id. at ¶ 43]. The Probation Office concluded that the recorded jail calls made by Petitioner indicated she attempted to continue her criminal behavior from jail following her guilty plea. These adjustments elevated Petitioner's Guidelines range to 324 to 405 months' imprisonment. [Id. at ¶ 79].

At the Petitioner's sentencing hearing, the Court provided the Petitioner an opportunity to renew her motion to strike the Government's untimely filings. [CR Doc. 48 at 8-9. In response, defense counsel made known his dismay regarding the lateness with which the Government filed its PSR objections but stated that he understood the futility of pursuing Petitioner's motion to strike: "At this point in time, Your Honor, I believe, quite frankly, after doing the research, that it seems that these late filed objections that they have made – they have explained the reasons for them and apparently the law is relatively lenient with that regard." [Id. at 9]. Thereafter, the parties argued their respective positions with regard to the PSR objections made. The Court overruled Petitioner's contention that she qualified for an acceptance of responsibility reduction and her objection to the enhancement for role in the offense. [Id. at 39]. Petitioner's ultimate

advisory Guidelines range therefore remained 324 to 405 months' imprisonment.  [Id.].   The Court sentenced Petitioner to a term of imprisonment of 324 months.  [Id. at 52-53].

Distilling her arguments to their essence, Petitioner argues that her trial counsel was ineffective by: (1) conceding a "winning argument" concerning the Government's untimely objections to the PSR; (2) failing to seek a continuance of the sentencing hearing once the Court decided to consider the Government's untimely objections to the PSR; and (3) not challenging the four-level enhancement she received for her role in the offense.  [CV Doc. 1-1 at 15-16].  Given the interwoven nature of the first two bases for this claim, the Court will address them together before proceeding to address Petitioner's third basis.

In seeking leave to file its objections out of time, the Government set forth a number of reasons why its late filing was justified.  Specifically, the Government noted that Petitioner's co-defendant Ronald Knowles had filed objections to his PSR on January 22, 2014, wherein he claimed that he was a minor or minimal participant in the conspiracy and that Petitioner was "clearly the mastermind of this operation."  [CR Doc. 25 at 3].  The Government argued that this assertion made it necessary for the Government to address the relative roles of both Defendants in their

respective PSRs.  [CR Doc. 30 at 1-2].  Next, the Government noted that it had recently received an IRS memorandum of the interview of Petitioner's co-conspirator Yolanda Birt Kitson and that Kitson's statements cast significant doubt upon the veracity of Petitioner's statement to the Government.  [Id. at 2].  Additionally, the Government stated that it recently had received copies of recorded jail calls made by Petitioner.  [Id.].

The Government had valid reasons for filing its objections out of time, and thus the Court properly granted the Government leave to do so.  The objections having been properly filed, the Probation Office was fully justified in revising the PSR to reflect this new information.

Significantly, Petitioner suffered no prejudice by the filing of these objections past the original deadline or by the subsequent revisions to the PSR.  At the time of the Government's filing, no sentencing date had yet been scheduled for Petitioner and in fact was not scheduled until April 24, 2014, nearly three months after the Government's objections were filed. Therefore, Petitioner's counsel had adequate time to respond to the objections and prepare for the sentencing hearing.  In fact, Petitioner's counsel filed a response to the Government's objections on February 5, 2014.  [CR Doc. 27].  While Petitioner was given the opportunity at sentencing to make further objections to the untimeliness of the

Government's objections, counsel prudently conceded that there was no basis to claim prejudice based on the timing of the Government's filing and therefore withdrew the motion to strike. Further, without any discernable prejudice, counsel simply had no valid reason to seek a continuance of the sentencing hearing. Counsel's performance in this regard was not deficient, nor did it prejudice Petitioner. Accordingly, Petitioner's first and second bases for her fourth claim of ineffective assistance counsel are thus without merit.

Petitioner fares no better with regard to the third basis for her fourth claim – her attorney's alleged ineffectiveness in failing to challenge the four-level enhancement she received for her aggravating role in the offense. First, contrary to Petitioner's argument, counsel did challenge the four-level enhancement in the written objections to the PSR [Doc. 27 at 2], and he renewed that objection at sentencing. A review of the record reveals, however, that the enhancement was correctly applied. Section 3B1.1(a) of the Sentencing Guidelines provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." As the Court noted at Petitioner's sentencing, Petitioner

was the one who prepared the returns, that she is the one who brought to this concerted criminal enterprise the knowledge and understanding of how to commit the offenses that are at issue here.

She is the one who brought Ms. Kitson, her sister, among others, into the conspiracy for the purpose of providing to her the information necessary to file the fraudulent returns and that the offense involved five or more participants and, in fact, considerably more. Therefore, the role of the defendant, Ms. Dill, in this enterprise was that of an organizer, as well as being a leader of the enterprise[.]

[CR Doc. 48 at 15-16]. Based on these findings, the four-level enhancement was properly applied. This basis for Petitioner's fourth ineffective assistance claim is therefore without merit.

Petitioner's fifth and final claim is her assertion that appellate counsel was ineffective in not raising "the most appropriate arguments" on appeal. [CV Doc. 1-1 at 17]. This claim appears in the allegations contained on Page 16 of her memorandum:

The Petitioner presented Appellate Counsel, information concerning her dispute with the sentencing enhancement for leader organizer of the conspiracy. Counsel could have but did not raise the issue that the social security numbers used for the tax filings, came from the Veterans Hospital. The Social Security numbers are the essential items needed for the success of this 'conspiracy' alleged in the indictment. Ms. Dill was not an employee, and never had access to the veterans hospital. The information could only hav come from another codefendant, who would have had access to protected health information and the computer access to obtain that information. Without that person the conspiracy for tax fraud could not have been started.

[Id. (grammatical and typographical errors in original)].

The Court has already addressed the application of the aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(a).  For the same reasons the Court determined that adjustment to have been properly applied, the Court finds that Petitioner's appellate counsel was not ineffective in failing to challenge such enhancement on direct appeal.  This leaves Petitioner's contention that the tax fraud conspiracy could not have started but for Ms. Kitson providing to her the personal identification information Kitson obtained from the veteran's hospital.  The issue of who provided the personal identification information used by the conspiracy, however, is irrelevant to the determination of Petitioner's leadership role.  A defendant need not be the source of the stolen identities in order to be deemed the leader or organizer of an identity theft conspiracy.  Here, the factual basis established by the Government demonstrated that Petitioner was the one who prepared the returns and who brought to the conspiracy the knowledge and understanding of how to commit the offenses at issue. The fact that Petitioner commissioned someone else to procure the stolen identities does not alter her leadership status.  Accordingly, Petitioner's appellate counsel was not

ineffective in failing to raise Petitioner's contention in this regard on direct appeal.

## CONCLUSION

Based on the foregoing, the Court finds that the claims in Petitioner's § 2255 motion all are without merit. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court declines to issue a Certificate of Appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable and that the petition states a debatably valid claim of the denial of a constitutional right).

## ORDER

**IT IS, THEREFORE, ORDERED** that Petitioner's 28 U.S.C. § 2255 Motion is **DISMISSED WITH PREJUDICE**. [CV Doc. 1].

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court **DECLINES** to issue a Certificate of Appealability.  The Clerk is directed to close this civil case.

**IT IS SO ORDERED.**

Signed: January 13, 2017

Martin Reidinger
United States District Judge